IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.   03-cv-1587-WYD-MEH

EDISYNC SYSTEMS, INC.,

      Plaintiff,

v.

CENTRA SOFTWARE, INC.;
CENTRA SOFTWARE, LLC; and
SABA SOFTWARE, INC.,

      Defendants.

---

## ORDER

---

I.     INTRODUCTION

THIS MATTER comes before the Court for construction of U.S. Patent No. 5,799,320 (the "'320 patent"), which has been assigned to Plaintiff EdiSync Systems, LLC ("EdiSync").  The parties have filed claim construction briefs and responses to those briefs.  On March 12, 2012, I held a full-day hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), during which the parties offered additional evidence and support of their proposed claim constructions, as well as a stipulation concerning claim construction issues.  At the conclusion of the hearing, I requested that the parties file supplemental claim construction briefs, which were filed on March 19, 2012.  Having fully considered the parties' claim construction briefs and the responses thereto, the parties' stipulation, the arguments offered during the *Markman* hearing, the parties' supplemental briefs and replies thereto, and the parties' various submissions of supplemental authority, I am prepared to issue a ruling

construing the disputed claims in the '320 patent.

II.    BACKGROUND

Edisync initiated this patent infringement case against Defendant Centra Software, Inc. on August 19, 2003, with the filing of its Complaint for damages and injunctive relief alleging infringement of the '320 patent, titled "Remote Multiple-User Editing System and Method," and another patent which is no longer subject to this litigation.  The invention set forth in the '320 patent is a computer file editing system that would allow multiple computer users to edit the same document from remote locations, such that multiple parties could collaboratively edit a computer file substantially in real-time.  As originally issued, the '320 patent contained claims 1-20.

On March 25, 2004, the United States Patent and Trademark Office ("USPTO") ordered a reexamination of the '320 patent.[1]  On April 28, 2009, the USPTO issued a reexamination certificate (the "First Reexamination") for the '320 patent, cancelling claims 1-20 and indicating that newly-added claims 21-48 were "determined to be patentable" and are subject to being pursued against potential infringers.  The First Reexamination resulted in the addition of a single phrase to the independent claims of the '320 patent specifying that edits are performed with a "single user application program."  This phrase was added to newly-presented claims 21, 30, 37, and 40 (formerly claims 1, 10, 17, and 20).

---

[1]In connection with their opening briefs regarding claim construction, the parties submitted a joint appendix that contains the entire prosecution history of the '320 Patent, including two reexamination proceedings.  The Joint Appendix (referred to herein as "JA") can be found in the docket at [ECF No. 217].  References to specific pages in the Joint Appendix will be denoted with the prefix "JA" followed by a corresponding page number.

The case was stayed during the pendency of the First Reexamination proceeding and reopened at EdiSync's request on February 2, 2009.  On April 10, 2009, I entered an Amended Scheduling Order, setting new discovery deadlines, and a briefing schedule on the issue of pre-reexamination certificate liability.  Given the changes made to the '320 patent during the First Reexamination, Defendants requested that the Court address whether the newly-added claims of the '320 patent were amended such that they are no longer "substantially identical" to the claims as they existed prior to reexamination.  A finding that the new claims were not "substantially identical" to the claims prior to reexamination would mean that Defendants are not liable for alleged infringement occurring prior to issuance of the First Reexamination certificate. *Engineered Data Products, Inc. v. GBS Corp.*, 506 F.Supp.2d 461 (D. Colo. 2007).  The parties filed opposing Motions for Partial Summary Judgment on this issue.  In those motions, the parties' requested construction of three disputed claim terms:  "personal computer," "host computer," and "single user application program."

I held a hearing on the motions for summary judgment and the parties' competing claim constructions on September 3, 2009.  However, on September 10, 2009, before an order resolving pre-reexamination liability could be issued, the parties informed the Court that the USPTO granted Defendants' request for a second reexamination of the claims that appeared in the newly-issued reexamination certificate for the '320 patent, based on prior art.  On November 5, 2009, I granted Defendants' motion to stay the case pending resolution of the second reexamination proceeding.

I entered an Order lifting the second stay on August 19, 2011.  On October 4, 2011, the USPTO issued a second reexamination certificate (the "Second

Reexamination"), which resulted in amendments to several claims.  EdiSync then filed

an Amended Complaint on October 17, 2011, which names several additional

Defendants including Centra Software, LLC, and Defendant Saba Software, Inc.

("Saba").[2]  In the Amended Complaint, EdiSync asserts infringement of the '320 patent,

specifically Claims 21-23, as amended by the Second Reexamination.

At this stage of the litigation, the parties both request construction of certain

claims, as amended by the Second Reexamination.  In addition, EdiSync maintains that

the issue of pre-reexamination liability, as set forth in the parties' 2009 motions for

summary judgment remains ripe for consideration.  In conjunction with this claim

construction order, I am prepared to resolve the issue of  pre-reexamination liability set

forth in EdiSync's Motion for Partial Summary Judgment, filed May 13, 2009 [ECF No.

95], and Defendants' Motion for Partial Summary Judgment, also filed May 13, 2009

[ECF No. 93].

III.    ANALYSIS

A.    Legal Standard

In a simple patent infringement case, the court first determines, as a matter of

law, the construction given to each patent claim.  *Markman v. Westview Instruments,*

*Inc.*, 517 U.S. 370, 385 (1996).  Whether infringement actually occurred is a question of

---

[2]Saba acquired the original Defendant, Centra Software, Inc., on January 31, 2006, and Centra Software, Inc. then merged into Centra Software, LLC, a wholly-owned subsidiary of Saba.

The Amended Complaint also asserted claims against several of Saba's customers.  Those claims were dismissed by stipulation of the parties by Order dated February 21, 2012.

fact submitted to the jury. *Id.* "The goal of patent claim construction is to spell out in layman's simple language the meaning and the scope of the legal language contained in a patent." *Phillips v. AWH Corp.*, 2002 WL 32827996, at *3 (D. Colo. Nov. 22, 2002). The Federal Circuit laid out the basic principles of claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). "'[T]he claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d at 1312-13 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). When construing a claim, courts must give the words of the claim their "ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (citation omitted). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent including the specification." *Id.* at 1313.

Deciphering claim language does not always turn on the parsing of erudite terms. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. However, when the claim terms have a particular meaning in the field, courts determine the ordinary and customary meaning by

looking first to "intrinsic evidence," which is the claims themselves, the specification,[3]

and the prosecution history, and, if the intrinsic evidence is ambiguous, "extrinsic

evidence," which includes a range of different sources such as expert testimony,

dictionaries, and technical treatises. *Id.* at 1312-18. The patent specification "'is always

highly relevant to the claim construction analysis. Usually it is dispositive; it is the single

best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

While "extrinsic evidence may be useful to the court, . . . it is unlikely to result in a

reliable interpretation of patent claim scope unless considered in the context of the

intrinsic evidence." *Id.* at 1319.

There are two exceptions to the general rule that claims are given their "ordinary

and customary meaning as understood by a person of ordinary skill in the art." First,

when a patentee sets out a definition and acts as his own lexicographer, and second,

when a patentee disavows the full scope of a claim term either in the specification or

during prosecution. *Vitronics Corp.*, 90 F.3d at 1580.

However, to act as its own lexicographer, a patentee must "clearly set forth a

definition of the disputed claim term" other than its plain and ordinary meaning. *CCS*

*Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Similarly, courts

have declined to apply the doctrine of prosecution disclaimer where the alleged

---

[3]Pursuant to 35 U.S.C. § 112, a patent specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

disavowal of claim scope is ambiguous.  *See Omega Eng'g, Inc. v. Rayteck Corp.*, 334

F.3d 1314, 1324 (Fed. Cir. 2003); *see also Storage Tech. Corp. v. Cisco Systems, Inc.*,

329 F.3d 823, 833-34 (Fed. Cir. 2003) (prosecution disclaimer cannot be used to depart

from the meaning of a term provided by the written description unless applicant's

statements constitute a clear and unambiguous disavowal of claim scope).

    B.    Disputed Claims

    The patent at issue describes a computer file editing system that would allow

multiple computer users to edit the same document from remote locations, such that

multiple parties could collaboratively edit a computer file substantially in real-time.  The

invention converts a set of personal computers ("PCs"), each set up to run programs

that would recognize edits from only one user, into a system that could recognize edits

from multiple users at the same time.  One or more of the PCs is designated as a host

computer that will coordinate edits to a file from the other PCs in the system, and

coordinate the transfer of data about the edits so that the other PCs can display the

updated file edits.

    As set forth in the '320 patent specification, the purpose of the invention "is to

provide an interactive editing system for a plurality of remotely located personal

computers which allows substantially simultaneous real time editing of a document

being edited by any of the personal computers at virtually any time."  *See* '320 Patent at

4:35-40.[4]  In order to achieve this purpose, the invention is comprised of: "a plurality of

personal computers, one for each of the users, at least one of the personal computers

---

    [4]The '320 Patent, dated August 25, 1998, is set forth at JA001583-99 [ECF No.
217-6].

using multi-tasking processing means, the personal computer using the multi-tasking processing means coordinating editing by the users through their respective personal computers of the file to be edited; and interconnecting means for interconnecting the personal computers." '320 Patent at 5:1-5:8.

All of the disputed terms appear in Claim 21.  Claim 21 of the '320 patent, as set forth in the Second Reexamination Certificate, describes:

> 21. A computer file editing system for a plurality of users at different remote locations, comprising:
>
> a plurality of personal computers, one for each of the users, each of said plurality of personal computers including computer file display means, at least one of said personal computers being designated host computer for given file editing operations and having multi-tasking processing means for coordinating the execution of said file editing operations comprising edits of less than the entirety of a given computer file inputted by at least the user of one of said personal computers, and for coordinating the transfer of data corresponding with and limited to said file editing operations from said host computer to the display means of the others of said plurality of personal computers, *wherein the coordinated transfer of data corresponding with and limited to said file editing operations includes file information received from file editing operations executed by a single user application program and constituting a portion of the given computer file*, whereby said file editing operations and said corresponding limited data transfer are performed in a predetermined manner by said host computer; wherein said given file editing operations are executed by one of said plurality of personal computers using *said* single user application program; and
>
> interconnecting means for electrically interconnecting said host computer with the others of said plurality of personal computers to permit transmission of electrical signals corresponding with said file editing operations there between;
>
> wherein said plurality of users are permitted to concurrently view said given computer file and, subject to practical system limitations, said computer file display means, multi-tasking processing means and interconnecting means operate so that said file editing operations and said corresponding limited data transfer to said display means occur on a substantially real-time basis relative to said edit inputs to permit said

plurality of users at said different remote locations to review with their respective display means said edits made to said given computer file substantially contemporaneously with the corresponding input of said edits and execution of said file editing operations.

*See* JA001573 (Second Ex Parte Reexamination Certificate) at 1:27-2:2 (italicized matter was added to the patent following the Second Reexamination proceeding).

Prior to the hearing, the parties filed a Stipulation in which they set forth the terms in Claim 21 that they seek to have the Court construe.  While the parties briefed additional claim construction issues in their opening claim construction briefs, they agreed to have the Court first construe only the following terms that they believe are most likely to impact the outcome of the case.

1.    *Personal computer*:

EdiSync proposes that the term "personal computer" be construed to mean "a single user microcomputer, not connected to a mainframe, designed for personally controllable applications."  This definition follows the express language of the '320 patent specification, with the additional statement that a personal computer is not connected to a mainframe.  *See* '320 Patent at 7:5-7.

Defendants agree EdiSync's proposed construction is supported by the patent specification as far as the original claims are concerned, but contend that during the First Reexamination proceeding, EdiSync expressly redefined the term "personal computer" to be a machine of a certain configuration and limited capabilities so that certain high-end or high performance computing devices that were covered by the original claims of the '320 patent are not longer covered by the claims in the reexamined patent.  Thus, Defendants would construe "personal computer" by reference to the

technical capabilities of personal computers in use at the time the patent application was originally filed (i.e. - a personal computer must not operate faster than 59MHz or use data addresses in excess of 16 bits).[5]  Defendants' definition arguably would not apply to any personal computer sold after 1990.

In support of their contention that EdiSync expressly redefined the term "personal computer," Defendants highlight statements made by EdiSync's expert, Gary J. Nutt Ph.D., during the First Reexamination proceeding, in which Dr. Nutt described the technical capabilities of a personal computer prior to the filing of the '320 patent application in 1989 as significantly less capable than workstations.  *See* JA000358-59 (Second Declaration of Gary J. Nutt under 37 C.F.R. § 1.132) at ¶¶ 7-8.[6]

However, Dr. Nutt's comments must be viewed in the context of the issues being addressed during the First Reexamination proceeding.  During this proceeding, the '320 patent was reexamined in view of an article by Sunil Sarin and Irene Grief (the "Sarin reference") titled "Computer-based Real-Time Conferencing Systems."[7]  While the Sarin reference describes software that had been developed for collaborative editing, EdiSync

---

[5]Defendants propose construing the term "personal computer" to mean "[a] stand-alone device that: (1) has an architecture complying with the IBM Personal Computer architecture that existed as of August 23, 1990; (2) has a central processing unit (CPU) that operates no faster than 50 MHz and supports the use of no more tha 16-bit addresses for instructions and data; and (3) does not need to be connected to a network or any other computer to operate or execute an application program.

[6]37 C.F.R. § 1.132 provides that "[w]hen any claim of an application or a patent under reexamination is rejected or objected to, any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for must be by way of an oath or declaration under this section."

[7]The article appears in the book *Computer-Supported Cooperative Work: A Book of Readings*, edited by Irene Grief, pp. 397-420 (1998 by Morgan Kaufmann Publishers, Inc.).

asserted that Sarin's invention relates exclusively to "workstations," as opposed to the personal computers utilized in the '320 patent. *See* Declaration of Gary Nutt, May 13, 2009 [ECF No. 95-1], at ¶ 21. EdiSync argued before the USPTO that because workstations were more capable than personal computers at that time, a person of ordinary skill in the art "would have recognized that Sarin's collaborative editing could not be applied to personal computers." *See Id.* at ¶ 22; JA000358-59 (Second Declaration of Gary J. Nutt under 37 C.F.R. § 1.132) at ¶¶ 7-8.

The statements of Dr. Nutt before the USPTO do not constitute a clear disavowal of the scope of the term "personal computer," as used in the '320 patent. *See Storage Tech.*, 392 F.3d at 833-34. Rather, these statements were merely descriptions of the abilities of personal computers in 1990 in the context of what developments were obvious to those skilled in the art at that time. As the patent examiner stated in the Notice of Intent to Issue Reexamination Certificate:

> Sarin discloses workstations rather than PCs as required by the claims, and Patent Owner has provided various expert declarations showing that one of ordinary skill in the art would have forseen the inability of certain applications of Sarin . . . host applications from running a PC vs a Sun-class workstation or minicomputer.

*See* JA000758 (Notice of Intent to Issue Reexamination Certificate). Moreover, the '320 patent expressly anticipates advances in the capabilities of PCs stating in the specification "'[w]ith the introduction of yet more powerful machines, the capabilities of personal computes will continue to evolve and expand." *See* '320 Patent at 7:15-17.

Thus, I see no reason to limit the construction of the term "personal computer" in the manner urged by Defendants. Therefore, I construe the term "personal computer"

to mean:  "a single user microcomputer, not connected to a mainframe, designed for personally controllable applications."

        2.     *Data corresponding with and limited to said file editing operations*, and *file information*:

The limitation "data corresponding with . . ." was added to the '320 patent as a clarifying amendment at the conclusion of the Second Reexamination proceeding.  The entire clause is recited as:

> wherein the coordinated transfer of *data corresponding with and limited to said file editing operations* includes *file information* received from file editing operations executed by a single user application program and constituting a portion of the given computer file . . .

*See* JA001573 (Second Ex Parte Reexamination Certificate) at 1:42-1:46 (emphasis supplied).

According to EdiSync, there is no need to construe the term "data corresponding with . . ." and it should be given its ordinary meaning.  Further, EdiSync would construe the term "file information" to mean "computer renderable information that identifies the file editing operations then occurring."  In the alternative, EdiSync would construe the term "data corresponding with . . ." to equal "file information," as defined.  In its supplemental claim construction brief submitted after the hearing, EdiSync proposed an amended construction of "computer renderable data, that identifies the given file editing operations, *which can be edited using the host computer.*"

Defendants have also offered several proposed constructions of these two terms. Prior to and during the hearing, Defendants proposed that the terms "data corresponding with . . . " and "file information" be limited such that the data coordinated

for transfer by the host PC includes only "*editable data* resulting from the given file editing operations."  In supplemental briefing submitted after the hearing, Defendants propose construing the terms to mean "the *actual information* resulting from the file editing operations, and not merely data representing an image of such information."

EdiSync's proposed construction would broadly define the scope of the information coordinated for transfer by the host PC to include any information that can be "rendered" on a computer display, while Defendants seek a more limited definition. Defendants assert that a limited construction is warranted based on statements made by EdiSync during the Second Reexamination proceeding.

 Because the terms at issue were added as clarifying amendments following the Second Reexamination of the '320 patent, and because Defendants arguments regarding construction of these terms are based on the doctrine of "prosecution disclaimer," it is useful to briefly summarize the Second Reexamination proceedings.

During the Second Reexamination, the USPTO rejected several of the claims in the '320 patent (including Claim 21) as obvious based on newly cited prior art, including the Bartholomew Patent.[8]  In response to this rejection, EdiSync asserted, among other arguments, that the difference between the system described in Claim 21 of the '320 patent and what is described in the Bartholomew Patent is that Bartholomew teaches a system where any and all screen display changes are communicated between PCs, regardless of whether those screen changes were the result of input from the various

---

[8]U.S. Pat. No. 4,939,509, entitled "Data Conferencing Arrangement For Stations Having Keyboards and Displays, Using a Keyboard Buffer and a Screen Buffer." [ECF No. 218-1].

PCs,  whereas the '320 patent provides for the transfer of data that "corresponds with and is limited to" file editing operations performed by the host computer to the display means of other PCs.  Thus, under Bartholomew, when the on-screen time clock is updated on one of the PCs, this "information" is communicated to the other PCs because the data is transferred by copying whatever information appears on the screen buffer, regardless of whether this information has any relevance to "data conference" activities.  *See* JA01423-24.  EdiSync noted that while "screen display changes" might contain a visual representation of any given file editing operation, such a system does not anticipate or render obvious the system set forth in the '320 patent because it does not teach the coordination and "transfer of data corresponding with and limited to said file editing operations," as recited in Claim 21.  *See* JA01425.

In an interview with the USPTO Examiner on May 10, 2011, EdiSync maintained that Bartholomew also teaches that the display data or "screen display changes" sent from PC1 to PC2 corresponds to pixel changes on a display.  *See* JA01470.  In the interview summary, the Examiner acknowledged that "while in Bartholomew any changes to the screen buffer are transferred to other PCs, the present invention transfers data limited to file editing operations," but requested "further clarification and additional explanation of the differences between the data sent from a host computer to a remote computer in accordance with the Bartholomew reference versus the data sent between the recited 'host computer' to the 'others of said plurality of personal computers' in accordance with the limitations of claim 21."  *See* JA01438; JA001476.

In an attempt to provide further clarification, EdiSync submitted a written interview statement and the Fifth Declaration of Gary J. Nutt.  *See* JA001475-1481.  In

the written statement, EdiSync noted that:

> a person of ordinary skill in the art . . . would have recognized that Bartholomew teaches the communication of non-editable data from a host to remote terminals.  In contrast, the ['320 patent], teaches the communication of editable data from the 'host computer' to the 'others of said plurality of personal computers. . . . Simply put, a non-editable system, a la Bartholomew, does not render obvious an editable system, a la Claim 21, et al.

JA001476.  In Dr. Nutt's Fifth Declaration, he further clarified that:

> an object of the '320 patent is to permit each of a group of users to edit information stored in a file of a single computer. Editing information using only images of the information rather than the information itself would be extremely difficult, e.g., changing the number "3" to the number "4."  For this reason, a person of ordinary skill in the art recognized that editable forms for information operate on the information itself rather than on an image of the information (e.g., one can use conventional programs to read and write a document in editable form, such as a Word file; however one can read, but typically cannot edit a document that has been translated into display form, such as a PDF file).  As a result, a fundamental tenet of the '320 patent is that the information, rather than an image of the information, is shared among the participants of a multi-user editing session.

JA001481.  Thus, the PCs operating under the system described in Bartholomew exchanged "bit map" or screen display changes that could not be edited.  In contrast, under the '320 patent, the information stored in a file of the host computer and provided to the remote PCs is "information" that is "editable."

The Examiner nevertheless rejected claims in the '320 patent over Bartholomew, stating that when in "editor" mode, the information Bartholomew sends corresponds "to the file editing operations."  *See* JA001486.

EdiSync appealed, and offered the following clarifying amendment:

> wherein the coordinated transfer of *data corresponding with and limited to said file editing operations* includes *file information* constituting a portion of the given computer file.

JA001487.  EdiSync asserted that "the limitation of 'data corresponding with and limited to' is properly construed as teaching the coordinated transfer of a specific type of data, namely 'the information itself.'" And that a person of ordinary skill in the art would understand that a "fundamental tenet" of the '320 patent is that it teaches the transfer of "file information," or information with respect to which a remote user could edit a file using the host PC, rather than an "image of information."  *See Id.* at JA001495.  Thus, EdiSync highlighted the ability to "access" information per the '320 patent, as distinguished from the ability to see a representation of the information.  EdiSync also noted that the source of information in the '320 patent is from that which is being "edited," whereas under Bartholomew, the source of the information comes from the "screen buffer."  *Id.*

The Examiner did not find the proposed clarifying amendment to fully overcome the Bartholomew reference, until an additional phrase was added further clarifying the source of the information communicated.  Following a second interview with the Examiner, EdiSync's proposed clarifying amendment:

> wherein the coordinated transfer of *data corresponding with and limited to said file editing operations* includes *file information* constituting a portion of the given computer file.

became:

> wherein the coordinated transfer of *data corresponding with and limited to said file editing operations* includes *file information* **received from file editing operations executed by a single user application program and** constituting a portion of the given computer file.

JA001517.  The approved clarifying amendment specified that the source of the "file information" being communicated is the "file editing operations executed by a single user application program," and not simply whatever changes occur in the screen buffer of the one of the PCs, as taught in Bartholomew.  In the Notice of Intent to Issue Reexamination Certificate, the Examiner referenced a power point presentation EdiSync introduced during the second interview, and noted that in the presentation, EdiSync demonstrated how in Bartholomew, the sending of screen updates always results in the same image being sent to all PCs, whereas under the '320 patent, "the sending of 'the file information' itself allows the data sent to be executed in each remote PC using the single user application program and thereby outputs of the data can differ from one PC to other remote PCs."  *See* JA001559 (Notice of Intent to Issue Reexamination Certificate).  A second Ex Parte Reexamination Certificate issued on October 4, 2011, that amended Claim 21 as discussed above.  *See* JA001569-75 (Ex Parte Reexamination Certificate).

Both of Defendants proposed constructions of the terms "data corresponding with . . ." and "file information" are based on the doctrine of prosecutorial disclaimer and their assertion that EdiSync narrowed the scope of Claim 21 during the Second Reexamination.  During the hearing, Defendants asserted that EdiSync distinguished the '320 patent from Bartholomew by claiming that the '320 patent required the transmission of *only* "editable" data, whereas Bartholomew teaches the communication of "non-editable" data or data comprised of an "image of the information."  It is true that in Dr. Nutt's Fifth Declaration, and in EdiSync's accompanying interview summary, EdiSync distinguished the type of information communicated under Bartholomew by

describing it as "image information" and "non-editable data."  Indeed, the interview

summary prepared by EdiSync's attorney after the first interview with the Examiner

states that "the ['320 patent] teaches the communication of editable data from the 'host

computer' to the 'others of said plurality of personal computers.'"  However, a review of

the entire context of EdiSync's argument reveals that EdiSync did not, as Defendants

contend, agree to give up coverage for systems that transmit only image information to

the remote computers.  EdiSync merely distinguished the sending of image information

generated from a screen display with the sending of file information that corresponds

with file editing operations.  I agree with EdiSync that the prosecution history, when

viewed as a whole, supports this position, and that Defendants' proposed construction

is incompatible with the preferred embodiment in the '320 patent, in which file edition

operations are executed by one of the plurality of personal computers using the single

user application program such that the "editing" occurs on the host computer.

First, upon review of all of the arguments urged by EdiSync during the Second

Reexamination proceeding, it is clear that the amendment added to Claim 21 during at

the conclusion of that proceeding was crafted to clarify the (1) type of information

communicated from the host PC to the remote PCs as file information corresponding

with file editing operations, and (2) the source of the file information as originating from

the single user application on the host computer.

I note that in the Examiner's second interview statement, she states in the '320

patent the host computer sends "the file information itself," as opposed to an image of

the data, "so that data is executed in each remote PC using the single user application

program and thereby outputs of the data can differ from one remote PC to other remote

PC at the user's preferences."  The Examiner further noted that EdiSync "agreed to

make amendments to the independent rejected claims to add that the data transfer

includes 'file information' coming from the 'single user application program' and not from

the 'screen buffer' as disclosed in Bartholomew."  *See* JA001537 (Ex Parte

Reexamination Interview Summary).  In addition, EdiSync clarified its understanding of

the agreement reached during the second interview in its supplemental response

following the second interview stating "it is [EdiSync's] understanding that all present at

the Interview agree that presently pending claim amendments are clarifying and not

narrowing."  *See* JA001529 (Amendment and Supplemental Response).  I do not find

evidence of a clear disclaimer as it relates to the terms "data corresponding with" and

"file information."  *See Storage Tech.*, 392 F.3d at 833-34.  I find that the amendments

to Claim 21 were clarifying amendments, and did not limit the scope of Claim 21.

In addition, I note that Defendants' attempt to limit construction of the term "data

corresponding with . . . " and "file information" to require the transmission of *only*

"editable" data is contrary to the preferred embodiment in the '320 patent, which does

not utilize the remote PCs to directly edit data.   The specification for the '320 patent

states that in the preferred embodiment, the central processing unit of the host PC

"interacts with the peripherals of the remote PCs like it interacts with its own peripherals.

Data input by a user of the remote PC via its keyboard is input directly to the host PC . .

.."  '320 Patent at 9:6-10.  Thus, "the microprocessors for the remote PCs perform a

supporting role only.  The keyboard, display and memory of each of the remote PCs act

as peripheral devices to the host PC."  '320 Patent at 9:39-42.  When any of the PCs

offers "input" the microprocessor on the host PC "enters the input and performs the

requested function on the file image in memory being edited . . . and sends any updates of the file to the displays [of the remote PCs] as they occur." *Id.* at 10:3-7.  Under the '320 patent, the form of the "file information," and whether it is "editable" by the remote PCs is irrelevant because all of the "editing" occurs on the host PC.

Defendants' alternate construction of the term "data corresponding with" to mean the "actual information resulting from the file editing operations, and not merely data representing an image of such information," does not provide additional clarity.  This proposed construction is not based on the language found in the '320 patent and its specification; rather, Defendants have plucked the phrase "actual information" from selected statements made by EdiSync's attorneys and expert during the Second Reexamination proceeding.  I note that, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *See Digital Vending Servs. Int'l v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012) (quoting  *Phillips*, 415 F.3d at 1317).  "For this reason it is particularly important not to limit claim scope based on statements made during prosecution '[a]bsent a clear disavowal or contrary definition.'" *Digital Vending*, 672 F.3d at 1276 (quoting *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1286 (Fed. Cir. 2011).  Again, Defendants are attempting to limit the type of data transferred to a particular form of information which must be *processed* in some way by the remote PCs.

As discussed above, I do not find that any of the arguments urged by EdiSync during the Second Reexamination to be limiting or to constitute a clear disavowal of the

scope of the '320 patent.  In addition, the specification for the '320 patent makes clear that the information shared with the remote PCs need not be in any particular form which would require the PCs to have specific processing and display capabilities, since the "microprocessors of the remote PCs perform a supporting role only," and "[d]ata input by a user of the remote PC via its keyboard is input directly to the host PC."  *See* '320 Patent at 9:39-42; 9:9-10.  Moreover, while it was necessary for EdiSync to explain the difference between "image information" and "actual information" in the context of distinguishing the '320 patent from the Bartholomew reference in the Second Reexamination proceeding, it is not necessary to include that distinction in construing the claims at issue.

Based on the above, I agree with EdiSync that the term "data corresponding with and limited to said file editing operations," should be construed to equate with the term "file information."  With respect to the term "file information," the '320 patent teaches that the host PC, after identifying the remote PCs and retrieving the file to be edited, sends the first screen of the file to the display of each PC.  *See* '320 Patent at 9:45-61.  The host PC then begins sequentially polling each of the PCs for input.  *Id.* at 9:63-64.  If there is input from a remote PC, the microprocessor on the host PC "then enters in the input and performs the requested function on the file image in memory . . . and sends any updates of the file to the displays [of the remote PCs] as they occur."  *Id.* at 10:3-6. Because the remote PCs do not perform editing operations and because they "do not necessarily have to have all of the capabilities of the host PC," (*id.* at 8:5-7) in order to display file updates that "correspond with" and are "limited to" the file editing operations occurring on the host PC, the "file information" must be in a form that is capable of being

rendered on the remote PCs' display.  The data communicated, regardless of form, must be capable of being rendered on a remote display - i.e. "computer renderable." Thus the term "file information" is properly construed as "computer renderable information" that "identifies the file editing operations then occurring."

Therefore, I find that the term "data corresponding with and limited to said file editing operations" is limited to "file information," which I construe to mean "computer renderable information that identifies the file editing operations then occurring."

3.     _Single User Application_:

This term did not appear in the '320 patent as originally filed.  Following the First Reexamination proceeding, the '320 patent was amended to include the phrase, "wherein said given file editing operations are executed by one of said plurality of personal computers _using a single user application program_."  _See_ '320 Patent, Claim 21.

EdiSync maintains that the added phrase merely specifies what was already required by the claim language when read in conjunction with the specification.  EdiSync contends that it was inherent in the original claims of the '320 patent that the described system uses a single user application program to perform the edits.  As EdiSync notes, the purpose of the '320 patent is to permit several users to edit a document through a single user application program running on the designated host computer.  As EdiSync pointed out in its briefing on the parties' motions for summary judgment, at the time the '320 patent was filed, multi-user application programs to perform editing functions on personal computers did not exist.  Thus, EdiSync contends that the purpose of the'320 patent was to enable PCs to perform collaborative editing despite the lack of available

multi-user application programs for PCs.[9]

 EdiSync further asserted that the claims are limited to use with personal computers, which inherently contemplates single user applications.  During the First Reexamination proceeding, EdiSync maintained that "traditionally a personal computer is defined as a single-user microcomputer designed for personally controllable applications . . . [and] one of ordinary skill would have understood the term 'personally controllable applications' to be synonymous with 'single user application program' and not with a 'multi-user application program.'"

Finally, EdiSync noted that the claims required designation of a host computer, which is only necessary if using a single user application to perform the edits.  As noted in the May 13, 2009, Declaration of Gary Nutt:

> [The '320 patent] designates a host computer to coordinate certain tasks.  These tasks are being coordinated specifically to provide multiple users shared access to the single-user application program.  By contrast, multi user applications would have accommodated multiple inputs from multiple users, making the portion of the invention concerning the designation of the host to perform certain functions superfluous.

Declaration of Gary Nutt, May 13, 2009 [ECF No. 95-1], at ¶ 18.

Construction of this term was previously briefed by the parties in connection with the their motions for summary judgment.  EdiSync has consistently advocated that this term should be construed to mean "a software program that *perceives* only a single user

---

[9]EdiSync's motion for summary judgment sets forth the following illustration: "with a single user application, A's computer is configured to accept edits only from A, but the '320 Patent creates a system whereby the computer can also accept and process edits from B and C as if entered from A."  *See* EdiSync's Motion for Partial Summary Judgment [ECF No. 95] at 16.

is providing inputs to the program at any given time."  Initially, Defendants requested that the term be construed to mean "a software program that *allows* only one user to input, present, view, display, execute, delete or otherwise manipulate audio, video, textual or graphical information."  In the March 2012, hearing on claim construction, Defendants modified their proposed construction to include "a software program *designed for use by only a single user* that is capable of running on a stand-alone personal computer."  In their supplemental briefing, Defendants offered an additional construction of the term to include "a software program *personally controllable by a single-user, not multiple users*, that receives inputs to the program at any given time from only a single user."

Defendants initial construction that would "allow" only one user input information, is contrary to the entire purpose of the '320 patent, which is to facilitate multiple users editing a file through a single user application program.  Defendants' modified construction that utilizes the term "designed for use" is beyond the scope of the '320 patent, and its specification and prosecution history, which are silent as to "design" of the "single user application program."  As discussed above, I construe the term "personal computer" to mean:  "a single user microcomputer, not connected to a mainframe, designed for personally controllable applications."  In addition, I agree with EdiSync that it is unnecessary to add "stand alone" as an additional modifier to "personal computer."

Defendants' most recent proposed construction recognizes that a "single user application program" receives inputs from a single user, but requires that it be "personally controllable by a single-user, not multiple users."  Again, this limitation is at

odds with the purpose of the '320 patent and contrary to its preferred embodiment, in which the host computer's microprocessor polls each of the remote PCs for input, and then coordinates the execution of multiple inputs using the single user application program.  *See* '320 Patent at 9:58-10:10.  The significance of the invention set forth in the '320 patent, is that the single user application program "perceives" or "recognizes" only a single user as providing inputs to the application program at any given time, despite the fact that multiple users are providing inputs.  Thus, the '320 patent allows for a system of collaborative editing without simultaneous editing, and is distinguishable over systems using multi-user application programs "specifically designed to interact with a multiplicity of users by . . . enabling each user to simultaneously interact with the application program."  *See* JA000455 (Third Declaration of Dr. Gary Nutt at ¶¶ 4-5).

I find EdiSync's proposed construction is supported by the claim language, specification, and prosecution history and, therefore, I construe the term "single user application program" to mean "a software program that *perceives* only a single user is providing inputs to the program at any given time."  In addition, I find and hold that this limitation was inherent in the original '320 patent and that the claim issued at the conclusion of the First Reexamination proceedings are substantially identical to the original claims, and constitute a continuation of the original patent.  *Engineered Data Products, Inc. v. GBS Corp.*, 506 F.Supp.2d 461 (D. Colo. 2007).

4.    *Given computer file*:

EdiSync contends that this term need not be separately construed.  Alternatively, EdiSync maintains that I should construe this term as "the particular computer file being edited."  Defendants would construe the term to mean "a certain set of data residing in

persistent memory of the host computer that is edited by a single-user application program running on the host computer." Defendants also offer an alternative construction of "[a] certain complete, named collection of information . . . that binds a conglomeration of instructions, numbers, words or image into a coherent unit that a user can retrieve, change, delete, save or send to an output device."

Defendants only support for their proposed construction is their contention that EdiSync "advocated" for this definition of the term "file" during the Second Reexamination proceedings. I disagree. While EdiSync discussed the definition of this term during those proceedings, it is clear that this discussion does not constitute a "clear disavowal" or an attempt by EdiSync to act as its own lexicographer. *See CCS Fitness, Inc.*, 288 F.3d at 1366; *see also Digital Vending*, 672 F.3d at 1276. Moreover, the phrase "given computer file" is comprised of easily understood terms and possesses a clear meaning in the context of the '320 patent and its specification. Defendants' proposed construction contains unnecessary and unsupported limitations. Therefore, I find the term requires no additional construction. *See Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206-07 (Fed. Cir. 2010) (a court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties); *see also Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] it is not an obligatory exercise in redundancy.").

     5.   *Means-Plus-Function Limitations*:

I now turn to the "means-plus-function" limitations in the '320 patent. *See* 35

U.S.C. § 112.  A means-plus-function limitation recites a particular function to be performed by a claimed apparatus without specifying the structure that performs that function.[10]  The limitation does not cover any conceivable structure, but only the structure disclosed in the specification for performing the claimed function, and equivalents of such structures.  *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indust. Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998).  Where claims are written as "means-plus-function" limitations, claim construction involves a two-step process.  First the court identifies the *function* described in the claim language, applying ordinary principles of claim construction; next, the court looks to the specification to determine what, if any, structure is disclosed to perform that claimed function.  *See Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113-14 (Fed. Cir. 2002).  Typically, this involves recitation of some structure corresponding to the means in the specification or prosecution history that "clearly link[ ] or associate[ ] that structure to the function recited in the claim."  *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).  However, even if the specification discloses a "corresponding structure," the disclosure must be adequate.  *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312-13 (Fed. Cir. 2012).  A "means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the

---

[10]Section 112 at ¶ 6 states "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

claim." *Id.* (quoting *AllVoice Computing PLC v. Nuance Commc'ns., Inc.*, 504 F.3d 1236, 1241 (Fed. Cir. 2007)).

In cases, like the case at bar, involving a computer-implemented invention in which the patentee has invoked means-plus-function limitations, the structure disclosed in the specification has to be more than a general purpose computer programmed to carry out a particular algorithm. *See Aristocrat Technologies Australia Pty Ltd v. Intern'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (noting that "[b]ecause general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112."). "A general purpose computer programmed to carry out a particular algorithm creates a 'new machine' because a general purpose computer 'in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.'" *Id.* (quoting *WMS Gaming, Inc. v. Int'l. Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999)). "Thus, in a means plus function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Id.* (quoting *WMS Gaming, Inc.*, 184 F.3d at 1349).

However, algorithms need not be disclosed for processes commonly performed in every computer. *See In re Katz*, 639 F.3d 1303 (Fed. Cir. 2011). In *Katz*, the Federal Circuit Court noted that the line of cases including *Aristocrat*, and *WMS*, *supra*, involved

"specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions."  *In re Katz*, 639 F.3d at 1316.  In contrast, claimed functions such as "processing," "receiving," and "storing," can be achieved by any general purpose computer without special programming, and, as such, it is "not necessary to disclose more structure than the general purpose processor that performs those functions."  *Id.* (noting that the functions of "processing," "receiving," and "storing" are coextensive with the structure disclosed, i.e., a general purpose processor).

Here, Claim 21 includes four limitations written in a "means-plus function" format including "multitasking processing means," "display means," "voice communication means," and "interconnection means."

a.    *Multi-tasking processing means:*

In Claim 21, the multi-tasking processing means is expressly recited as performing two operations:[11]

> *coordinating the execution of said file editing operations comprising edits of less than the entirety of a given computer file inputted by at least the user of one of said personal computers*:

or, "coordinating editing," and

> *coordinating the transfer of data corresponding with and limited to said file editing operations from said host computer to the display means of the others of said plurality of personal computers*:

or, "coordinating data transfer."

_____

[11]Defendants initially asserted that five additional functions are performed by the multi-tasking processor means.  As part of the Stipulation Concerning Construction Issues [ECF No. 225], the parties requested that I construe only the terms set forth as "coordinating the execution," and "coordinating the transfer."

The parties agree that the functional language related to "coordinating editing" should be given its ordinary and usual meaning.  I agree that the words comprising this term are common, non-technical terms that need not be separately construed.  The concept of "coordination," is readily understood to mean a "to put in the same order or rank," or "to bring into a common action, movement, or condition (i.e. - we need to coordinate our schedules)."  *See* http://www.merriam-webster.com/dictionary/coordinate.  Similarly, the words "execution," "file editing operations," and "a given computer file," are easily understood.

As to the term "coordinating data transfer," Edisync again asserts that the ordinary meaning of the term applies, whereas Defendants propose construing the term to mean "sending *editable data* resulting from the given file editing operations to the display means of the other personal computers," or "sending *the actual information* resulting from the file editing operations, and not merely data representing an image of such information, to the display means of the other personal computers."  As discussed above, I am not persuaded by Defendants' argument that the data coordinated for transfer by the host PC is limited to "editable data" or "the actual information resulting from the file editing operations."  In addition, Defendants' proposed construction improperly equates the term "coordinating" with "sending."  The term "coordinating" is not ordinarily understood to include the concept of "sending."  However, to the extent that the coordinating means is responsible for the "sending" of data, the '320 patent need not disclose an algorithm associated with this function because "sending" can be achieved by any general purpose computer without special programming.  *In re Katz*, 639 F.3d at 1316.

As previously discussed, I find that the term "data corresponding with and limited to said file editing operations" equates to "file information," which I construe to mean "computer renderable information that identifies the file editing operations then occurring."  The functional limitation of "coordinating data transfer" need not be separately construed because when read in conjunction with those terms, "coordinating data transfer" means "coordinating the transfer of file information," or "coordinating the transfer of computer renderable information that identifies the file editing operations then occurring."

I must next identify the associated structures set forth in the '320 patent that correspond with "coordinating editing" and "coordinating data transfer."  EdiSync's latest proposal identifies those structures as "hardware, software and/or a combination thereof which enables a personal computing device to multi-task, and coordinate both editing and data transfer."  Defendants contend that the '320 patent is indefinite under *Aristocrat*, *supra*, because it does not disclose any special algorithm to "coordinate editing" or "coordinate data transfer."  I disagree and find that the functions associated with these terms can be implemented by a general purpose processor and do not constitute specific computer-implemented functions to which corresponding algorithms must be disclosed.  *See In re Katz*, *supra*.

As discussed at the hearing on claim construction, the '320 patent sets forth eight different embodiments or examples of how the coordination of file editing operations and/or the coordinated transfer of data corresponding and limited to such file editing may occur.  These examples include: (1) one for the use of the hardware and software components and/or algorithms shown in the '320 patent in

Figures 2 and 3A and described at 7:25-62, 8:1-2, 8:55-65, 9:2-13, 9:48-51 and 11:31-32, namely a host PC's "input/output processor," central processing unit "CPU" and multi-tasking operating system; (2) one for use of the components of the first embodiment except no buffers are used and a polling function is not performed, *id.* at 11:43-49; (3) one for the use of a software algorithm, in conjunction with the previously identified hardware and software, to accomplish polling, *id.* at 9:44-10:8; (4) one for the use of a software algorithm, in conjunction with previously identified hardware and software, to perform "complex functions," *id.* at 10:31-40; (5) one for the use of a software algorithm, in conjunction with previously identified hardware and software, to perform multiple user editing on different portions of a computer file, *id.* at 10:48-65; (6) one for the use of a software algorithm, in conjunction with previously identified hardware and software, to enable the lock-out of users, *id.* at 11:11-23; (7) one where the process of editing includes the providing of verbal commands to a single PC user, who inputs all the "edits," in conjunction with previously identified hardware and software, *id.* at 11:24-42; and (8) one where data compression/decompression hardware and/or software is utilized, in conjunction with previously identified hardware and/or software, *id.* at 12:37-39.

I find that a person of ordinary skill in the art would appreciate, based on the teachings in the '320 patent, that the hardware and/or software utilized for each of these eight embodiments would commonly include a CPU, and input/output processor ("IOP"), as well as various other hardware and/or software components, such as memory devices, decompression devices.  *See* Declaration of Gary Nutt, Feb. 10, 2012 [ECF No. 218-3] at ¶¶ 16-17; EdiSync's Supplemental Claim Construction Table [ECF No.

218-1] at pp. 1-14.  Thus, I find EdiSync's identification of "hardware, software and/or a combination thereof which enables a personal computing device to multi-task, and coordinate both editing and data transfer," to appropriately identify the structure associated with "coordinating editing" and "coordinating data transfer," given the large number of alternative embodiments identified in the '320 patent.

> b.    *Display means*:

With respect to the "display means," claim 21 recites: "computer file display" and "[t]o operate so [as] to permit said plurality of users . . . to review with their respective display means said edits made to said given computer file."  Here, the parties differ on both the function of the "display means," and whether sufficient structure is identified in the '320 patent specification for the "display means."

EdiSync asserts that the functional language should be given its plain and ordinary meaning or, alternatively, should be construed to mean "to visually present the file editing then occurring to a user of each of the PCs."  Defendants would construe the functional language as "displaying to a user a representation of the actual information (or editable data) that a personal computer receives from the host computer."

The parties' disagreement with respect to the meaning of the function of the "display means" is closely related to their disagreement concerning the *type* of information or data coordinated for transfer by the host PC.  As previously discussed, I reject Defendants' contention that data coordinated by the host computer is limited to include only "actual information" or "editable data."  In addition, having previously construed the term "file information" to mean "computer renderable information" that "identifies the file editing operations then occurring," it follows that the function of the

"display means" is simply to "display" the "computer renderable" data received.  In addition, the '320 patent refers to the "display" as a device that facilitates visual perception.  *See* '320 Patent at Fig. 1; Fig. 2; 8:9-10; 63-65 (the peripherals of the remote PCs include the keyboard, the display, and memory).  Thus I adopt EdiSync's proposed construction and find that the function of the "display means" is "to visually present the file editing then occurring to a user of each of the PCs."

Having construed the functional language of "display means," I must now identify the corresponding structure.  EdiSync identifies this structure as "hardware and software that are configured to convert file information into a human visual[ly] perceptible image."  Defendants assert that this limitation is indefinite because no corresponding structure or algorithm is disclosed in the specification that could be used to interpret and process the file information for display.  EdiSync admits that no special algorithms are taught but asserts that none are needed.  EdiSync notes that the function of the "display means" is simply to display data received from the host computer, and contends that the '320 patent provides a disclosure commensurate with the common and ordinary use of "display."  I agree.  While EdiSync acknowledges that any information intended for presentation on a visual display typically requires some post output or pre-display processing, particularly when a remote PC does not have the same display devices as the host PC, such "post receipt" processing does not require special programming.

The '320 patent refers to "a display device" which facilitates the *visual* perception of information, but does not otherwise require "special" functions that would require specific programming.  Under *In re Katz*, *supra*, algorithms need not be disclosed for

-34-

processes commonly performed in every computer.  Because the function of the "display means" is "to visually present the file editing then occurring to a user of each of the PCs," I find that a person of ordinary skill in the art would have understood the '320 patent's reference to PC displays as encompassing the use of any display technologies in existence at the time of the invention.  The specification refers to the peripherals of the host PC and the remote PCs and including a keyboard, display and memory.  *See* '320 Patent at Fig. 1; Fig. 2; 8:9-10; 63-65.  In the preferred embodiment, the "keyboard, display and memory of each of the remote PCs act as peripheral devices to the host PC."  *See* '320 Patent at 9:39-42.  "After the host PC retrieves a file for editing from the memory of any of the PCs, the first screen of the file is typically sent to each PC and displayed on the display of each PC."  Thus, "[a] [person of ordinary skill in the art] would recognize that the '320 patent's reference to PC displays as calling forth particular hardware components, namely display devices that are PC compatible."  *See* Declaration of Gary Nutt, Feb. 10, 2012 [ECF No. 218-3] at ¶ 24.  Therefore, the structure associated with the "display means" should not be limited to a particular display technology, and appropriately includes all "hardware and associated software that are configure to convert 'file information' into a human visually perceptible image."

c.    *Voice communication means*:

With respect to the "voice communication means," claim 21 recites: "transmitting audio signals between at least two of said users, said audio signals being representative of the corresponding user's voice."  The parties agree that this language should be given its ordinary and usual meaning and need not be separately construed.  Because the parties agree that no construction of the functional language is necessary, I need

only identify the structure or structures that perform this function.

EdiSync claims the structure includes "hardware and/or software which enables a user of a PC to communicate orally with another remote user."  Defendants' claim the structure includes "telephone handsets," per Fig. 1, elements 16, 18, 20, and per Fig. 4, elements 52, 54, 56, that are "linked via either digital communication network 22 or separate analog phone lines."  *See* '320 Patent at 9:18-30 (noting that in Fig. 1 the telephone handsets associated with each of the PCs are also linked over the digital communications network), and 12:31-36 (noting that in Fig. 4 the telephone handsets are connected over a separate analog communication line, which differs from the preferred embodiment where voice and data communications are over the same line).

Defendants note that their proposed construction identifies the structures that are *actually disclosed* in the specification for performing the claimed function (i.e. - telephone handsets).  However, EdiSync contends that its proposed structure best encompasses the various embodiments taught in the '320 patent specification because it recognizes that in all embodiments, a voice communication means typically includes a handset and, depending upon whether analog voice or digital voice is being communicated, may also include software components commonly used to support digital and analog voice.  EdiSync maintains Defendants' construction limits the structure to only telephone handsets and ignores the use of standard telephone equipment and other technologies that support digital voice signals (one of the preferred embodiments in the '320 patent).

Here, I find that Defendants' proposed construction is unduly limiting since the '320 patent teaches various embodiments of devices that may be used to communicate

human voices to others including: digital telephone handsets and telephones, *see* '320 Patent at Fig. 1, elements 16, 18, and 20; 6:61-64 ("[t]he telephone handsets 16, 18, 20 are preferably digital telephones and are connected over the same line of the digital communications network as are the PCs;" analog telephone handsets and analog telephones, *id.* at Fig. 4, elements 52, 54, and 56; 12:31-36 ("[t]he telephone handsets 52, 54, 56 are connected over a separate analog communication line 66"); standard telephone equipment and lines to establish a conference call, *id.* at 2:48-50; 9:36-39; 11:46. Thus, I adopt EdiSync's proposal and find that the structure associated with "voice communication means" is "hardware and/or software which enables a user of a PC to communicate orally with another remote user."

        d.    *Interconnection means*:

With respect to the "interconnection means," claim 21 recites:  "electrically interconnecting said host computer with the others of said plurality of personal computers to permit transmission of electrical signals corresponding with said file editing operations there between."  Again, the parties agree that this language should be given its ordinary and usual meaning and need not be separately construed. Because the parties agree that no construction of the functional language is necessary, I need only identify the structure or structures that perform this function.

EdiSync claims the structure includes "hardware and software, provided in and/or connected to a PC, which enables the PC to connect to an analog and/or digital network."  These structures include only those devices (hardware and software) that the host computer utilizes to establish an electrical connection with one or more networks. As EdiSync notes, the '320 patent does not recite a particular form of network but

discloses various devices that may be used to "interconnect" including: digital telephones, *see* '320 Patent at 6:61-634; adapters for connection to an integrated services digital network, *id.* at 8:41-45; high-speed modems and modems having data compression and decompression capabilities, and associated hardware and software, *id.* at 12:1-2, 8-11, 17-21, 12:38-39 and 43-44; and multiplexers, *id.* at 12:61.

Defendants note that the specification describes both a "digital embodiment" and an analog embodiment" and identifies structures associated with each of those specific network embodiments.  EdiSync contends that the structure corresponding with "interconnecting means" does not include the "network" or communications system" but only the components that allow the PCs to connect to the network.

Here, I agree with Defendants that "interconnecting means" includes both devices that enable a PC to connect to a network, and various network elements that facilitate communication along a digital or analog network.  In addition to the devices identified above, the '320 patent also discloses interconnecting networks including digital communications networks, *see* '320 Patent at 9:20-23, 24 and 27; integrated services digital networks and non-dedicated digital communications networks, *id.* at 8:24-29; plain old telephone service networks, *id.* at 12:2; analog communications networks, *id.* at 12:51-52, and 62, and the Internet (network bridges and gateways), *id.* at 5:65-6:2, and 7:1-4.

Thus, I find that the structure associated with "interconnecting means" includes all "hardware and software, provided in or connected to a PC, which enables the host PC to connect to an analog and or/digital network and any networks and/or communications systems utilized to facilitate communications between the host PC and

one or more remote PCs."

IV.    CONCLUSION

Therefore, it is ORDERED that the disputed terms in Claim 21 shall be construed as set forth herein.  It is

FURTHER ORDERED that EdiSync's Motion for Partial Summary Judgment, filed May 13, 2009 [ECF No. 95] is **GRANTED** as set forth herein.  It is

FURTHER ORDERED that Defendants' Motion for Partial Summary Judgment, filed May 13, 2009 [ECF No. 93] is **DENIED**.

Dated:  June 15, 2012.

BY THE COURT:


s/ Wiley Y. Daniel
WILEY Y. DANIEL,
CHIEF UNITED STATES DISTRICT JUDGE